IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-340

No. COA20-108

Filed 17 May 2022

Mecklenburg County, Nos. 18 CRS 427-28

STATE OF NORTH CAROLINA

v.

JAHZION WILSON, Defendant.

Appeal by Defendant from judgments entered 13 June 2019 and order entered 14 June 2019 by Judge Forrest D. Bridges in Mecklenburg County Superior Court. Heard in the Court of Appeals 23 February 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Amy Kunstling Irene, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender David W. Andrews, for Defendant.*

GRIFFIN, Judge.

¶ 1 Defendant Jahzion Wilson appeals from an order denying his motion to suppress and from judgments entered upon jury verdicts finding him guilty of attempted robbery with a firearm and first-degree murder. Defendant argues that the trial court erred by (1) denying Defendant's challenge for cause to dismiss a juror; (2) denying Defendant's motion to suppress; (3) failing to instruct the jury on second-degree murder as a lesser-included offense of first-degree murder; (4) failing to order

a transfer hearing; and (5) allowing the State to prosecute Defendant for felony murder in violation of his right to due process. After review, we conclude that Defendant received a fair trial, free from error.

## I. Factual and Procedural Background

¶ 2 On 18 June 2017, Zachary Finch, barely twenty-one years old, planned to go to a park to buy a cell phone from a person he believed to be "a dad with his two kids" on Father's Day. Zachary left his home to get the phone, and his body was later found outside an apartment complex with "loose cash near him[.]" Zachary had sustained one gunshot wound to the chest and was deceased. Before his death, Zachary was using the app LetGo to arrange for the purchase of a phone. Police used the app records to get an email from the individual Zachary had been communicating with regarding the phone purchase. This email led them to Defendant.

¶ 3 On *voir dire*, Defendant's mother testified police officers contacted her and arranged to meet with Defendant at his grandmother's home, as Defendant was "a witness in a larceny case[.]" According to Defendant's mother on *voir dire*, the officer told her Defendant was "not in trouble for anything" but may "have witnessed something[.]" The officers met with Defendant and his parents. Defendant was fifteen years old at the time.

¶ 4 Defendant's parents allowed the officers into his grandmother's home to talk to Defendant, and the officers questioned Defendant in the presence of his parents.

During the questioning, Defendant told the officers about arranging for the sale of a cell phone using the LetGo app. Defendant said that he and a friend, Tink, and Monte, a relative of Tink, went to meet Zachary at the Arbor Glenn apartment complex to sell the cell phone and then left without an issue. At this point, one of the officers asked about "an incident that occurred. That's why I am here. I didn't just come here to talk to you about buying or selling phones. That doesn't make any sense. You said you will be honest with me[,] and you'll be honest with your parents, and this is where it has to start."

¶ 5        Defendant initially repeated that he had left the apartment complex without incident, and Defendant's parents both encouraged Defendant to tell the truth. Defendant's father stated, "You did it, whatever yall did it's done man up to it." Defendant continued to answer questions and ultimately stated that the "[d]eal went wrong" and Zachary "got shot." Even after Defendant admitted Zachary had been shot, his parents continued to encourage him to tell the officers what happened. Defendant's mother told him, "Don't sit here and lie[,]" and, "Finish telling this damn story. Now."

¶ 6        Defendant continued answering questions and confirmed to officers that when Zachary was "running off he g[ot] shot[.]" When asked if Tink shot Zachary, Defendant responded, "I guess." When asked why Zachary began to run, Defendant stated "he was fixin to get robbed by" Tink. Eventually, Defendant confirmed he saw

Tink "pull his gun to shoot" Zachary, and thereafter Defendant stated he knew Tink took "a gun everywhere" and that Tink wanted to rob Zachary.

¶ 7        Defendant insisted his own plan was not to rob Zachary but rather to sell him the phone.  Defendant said he told Tink "you ain't got to rob him just sell him the phone[.]"  Finally, Defendant admitted that he too had a gun.  An officer asked Defendant to explain what had happened to Zachary, and Defendant responded, "He died."  The questioning then ended.

¶ 8        Per the trial court's description, before Defendant's trial he "filed multiple Motions to Suppress, including amended and duplicate motions."  We need not address each motion separately, as the trial court addressed "the treatment of these motions in a single order."  Ultimately, the trial court entered a nine-page order suppressing other statements made by Defendant when he was in custody but denying the motion to suppress as to the statements Defendant made during the in-home interview, his cell phone contents, and the testimony of two individuals Defendant had purportedly told about the crimes.

¶ 9        During Defendant's trial, a girl he used to date testified Defendant told her after the incident that he had shot and robbed someone.  Another friend of Defendant also testified that Defendant had told him he killed someone on Father's Day and there were no witnesses.  The jury found Defendant guilty of attempted robbery with a dangerous weapon and first-degree murder.  The jury found Defendant not guilty

of conspiracy to commit robbery with a firearm. The trial court arrested judgment on the attempted robbery with a dangerous weapon conviction and sentenced Defendant to life imprisonment with the possibility of parole on the first-degree murder conviction. Defendant appeals.

## II. Analysis

¶ 10        Defendant argues that the trial court erred by (1) denying Defendant's challenge for cause to dismiss a juror; (2) denying Defendant's motion to suppress; (3) failing to instruct the jury on second-degree murder as a lesser-included offense of first-degree murder; (4) failing to order a transfer hearing; and (5) allowing the State to prosecute Defendant for felony murder in violation of his right to due process.

¶ 11        As to issue (5), Defendant contends the trial court violated his "right to due process by allowing the State to prosecute him under felony murder because felony murder is based on deterrence, which is not effective for juveniles and should not apply to them." Defendant directs our attention only to research regarding adolescent brain development. Defendant has failed to cite any law indicating a juvenile may not be convicted of felony murder, and thus this argument is abandoned. *See generally* N.C. R. App. P. 28(b)(6) (noting an argument should contain citations).

¶ 12        Our analysis is limited to Defendant's four remaining arguments.

## A. Juror Challenge

¶ 13        Defendant argues that "the trial court erred by denying [Defendant's] challenge for cause to [dismiss a juror] because [the juror] repeatedly stated that he could not give [Defendant] a fair trial and made clear during his voir dire testimony that he was in 'favor of the prosecution.'" We hold that Defendant failed to preserve this issue for appeal.

¶ 14        N.C. Gen. Stat. § 15A-1214(h) provides:

> (h) In order for a defendant to seek reversal of the case on appeal on the ground that the judge refused to allow a challenge made for cause, he must have:
>
>> (1) Exhausted the peremptory challenges available to him;
>>
>> (2) Renewed his challenge as provided in subsection (i) of this section; and
>>
>> (3) Had his renewal motion denied as to the juror in question.

N.C. Gen. Stat. § 15A-1214(h) (2019). Pursuant to subsection (i) of the statute, a defendant must follow a specific procedure when renewing his challenge to a juror for cause:

> (i) A party who has exhausted his peremptory challenges may move orally or in writing to renew a challenge for cause previously denied if the party either:
>
>> (1) Had peremptorily challenged the juror; or
>>
>> (2) States in the motion that he would have challenged that juror peremptorily had his challenges not been

exhausted.

*Id.* § 15A-1214(i). "The statutory procedure is mandatory and must be followed precisely." *State v. Garcell*, 363 N.C. 10, 28, 678 S.E.2d 618, 630 (2009) (citations omitted) (holding that the defendant "failed to properly preserve" his challenge of a juror for cause because he did not follow the procedures "established by N.C.G.S. § 15A-1214(h) and (i)").

¶ 15      In this case, Defendant followed procedures (1) and (3) of N.C. Gen. Stat. § 15A-1214(h). However, Defendant did not adhere to the procedures in subsection (i) of the statute. Specifically, Defendant did not previously "peremptorily challenge the juror" or state in a motion to renew his challenge for cause "that he would have challenged that juror peremptorily had his challenges not been exhausted." N.C. Gen. Stat. § 15A-1214(i). Defendant therefore failed to preserve this argument for appeal.

¶ 16      Defendant argues that "even assuming the defense attorney did not comply with N.C. Gen. Stat. § 15A-1214(h) and (i), those provisions are not controlling because they conflict with the North Carolina Constitution[,]" citing *State v. Oglesby*, 361 N.C. 550, 554, 648 S.E.2d 819, 821 (2007). In *Oglesby*, our Supreme Court held that "a 2003 amendment to the North Carolina Rules of Evidence" was unconstitutional because there was "a direct conflict between this evidentiary rule and North Carolina Rule of Appellate Procedure 10(b)(1)." *Id.* Because "[t]he Constitution of North Carolina expressly vests in [the Supreme Court] the 'exclusive

authority to make rules of procedure and practice for the Appellate Division[,]'" the Court reasoned that the legislature's 2003 amendment to the evidentiary rule was unconstitutional. *Id.*

¶ 17 Nonetheless, our Supreme Court specifically held two years later in *Garcell* that the statutory procedure "established by N.C.G.S. § 15A-1214(h) and (i)" was "mandatory and must be followed precisely." *Garcell*, 363 N.C. at 28, 678 S.E.2d at 630. Although the decision in *Oglesby* may conflict with its decision in *Garcell*, the holding in *Garcell* has not been overruled, and we are therefore bound to follow it.

¶ 18 "Because [D]efendant failed to preserve this issue for appellate review, this assignment of error is overruled." *Garcell*, 363 N.C. at 28, 678 S.E.2d at 630.

## B. Motion to Suppress

¶ 19 Defendant argues that "[t]he trial court erred by denying the motion to suppress[1] [Defendant]'s confession where detectives gained access to [Defendant], a [fifteen]-year-old boy, by deceiving his mother, repeatedly told [Defendant] he was

---

[1] The trial court's order denying Defendant's motion to suppress was reduced to writing and entered on 14 June 2019, the day *after* his judgments were entered. The trial court stated it was denying Defendant's motion and would "enter detailed written orders" "prior to the conclusion of this case." Defendant's counsel specifically noted he would appeal. Defendant's counsel also objected to the admission of the confession during trial. Ultimately, Defendant also orally appealed at the close of his trial. No written notice of appeal has been filed, but the State has not raised a preservation issue on this specific issue, and thus we address Defendant's appeal of the denial of his motion to suppress, as there appears to be no issue with notice, and it was the trial court's delay in filing the written order which resulted in Defendant's inability to refer to the order at the time he orally gave notice of appeal.

lying, and capitalized on the presence of his parents to extract the confessions from

him[.]"

> The standard of review in determining whether a trial court properly denied a motion to suppress is whether the trial court's findings of fact are supported by the evidence and whether its conclusions of law are, in turn, supported by those findings of fact. The trial court's findings are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting. The determination of whether a defendant's statements are voluntary and admissible is a question of law and is fully reviewable on appeal. We look at the totality of the circumstances of the case in determining whether the confession was voluntary. Factors we consider include:

>> whether [the] defendant was in custody, whether he was deceived, whether his *Miranda* rights were honored, whether he was held incommunicado, the length of the interrogation, whether there were physical threats or shows of violence, whether promises were made to obtain the confession, the familiarity of the declarant with the criminal justice system, and the mental condition of the declarant.

> A confession may be used against a defendant if it is the product of an essentially free and unconstrained choice by its maker. However, where a defendant's will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. Our Supreme Court stated in *State v. Jackson* that:

>> While deceptive methods or false statements by police officers are not commendable practices, standing alone they do not render a confession of guilt inadmissible. The

> admissibility of the confession must be decided by viewing the totality of the circumstances, one of which may be whether the means employed were calculated to procure an untrue confession.

*State v. Cortes-Serrano*, 195 N.C. App. 644, 654–55, 673 S.E.2d 756, 762–63 (2009) (citations, quotation marks, and brackets omitted).

¶ 20    In *State v. Martin*, citing *Cortes-Serrano*, this Court explained the factors for consideration as to the voluntariness of a defendant's confession:

> The determination of whether a defendant's statements are voluntary and admissible is a question of law and is fully reviewable on appeal. The voluntariness of a confession is determined by the totality of the circumstances. The requisite factors in the totality of the circumstances inquiry include: 1) whether the defendant was in custody at the time of the interrogation; 2) whether the defendant's *Miranda* rights were honored; 3) whether the interrogating officer made misrepresentations or deceived the defendant; 4) the interrogation's length; 5) whether the officer made promises to the defendant to induce the confession; 6) whether the defendant was held incommunicado; 7) the presence of physical threats or violence; 8) the defendant's familiarity with the criminal justice system; and 9) the mental condition of the defendant.

*State v. Martin*, 228 N.C. App. 687, 689–90, 746 S.E.2d 307, 310 (2013) (citations and quotation marks omitted).

¶ 21    Defendant raises arguments regarding several factors noted in *Martin*, *see generally id.*, including the naiveté of youth; Defendant's lack of experience with

police; deception by police by informing Defendant's mother they were investigating a larceny rather than a murder; police repeatedly stating that they did not believe Defendant or that he was lying; and the pressure Defendant's parents put on him to speak truthfully with police. Defendant does not contest any of the trial court's findings of fact, which are binding on appeal. *See State v. Stanley,* 259 N.C. App. 708, 711, 817 S.E.2d 107, 110 (2018) ("When a motion to suppress is denied, this Court employs a two-part standard of review on appeal: The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law. Unchallenged findings of fact are deemed to be supported by competent evidence and are binding on appeal." (citation and quotation marks omitted)).

¶ 22    The binding findings of fact are:

> 4.    On July 20, 2017, the police arranged for an interview with [] Defendant. They did so by contacting Defendant's mother and asking permission to speak with [] Defendant. This interview then took place in the living room of Defendant's grandmother, in the presence of his mother and father. [] Defendant and his parents were specifically told that [] Defendant was not in custody, and neither [] Defendant nor his parents were told the detectives were investigating the murder of the victim. Defendant was in familiar surroundings, was not restrained in any way and was surrounded by family members throughout the interview process. Two plain clothed detectives were present in the interview, each of

whom carried a firearm, but neither officer brandished or otherwise displayed a firearm during the interview. The manner of questioning was relaxed and was not abusive, threatening or coercive in any way.

5.    The interview was audio recorded.

6.    [] Defendant was able to answer the questions asked of him by the detectives, did not have to ask them to repeat or restate their questions and demonstrated understanding of the seriousness of the situation.

7.    In the context of the questioning, [] Defendant demonstrated the ability to differentiate between a lie and the truth. His explanations were coherent, rational, and appropriate for his age. He did not demonstrate any signs of diminished capacity, emotional, psychological or intellectual deficiency, or impairment due to drugs or alcohol. [] Defendant appeared to act in a manner that was appropriate for his stated age of 15 years.

8.    When asked during the in-home interview if [] Defendant knew why the detectives had come to speak to him, [] Defendant acknowledged he knew why they had come to speak with him.

9.    While difficult to hear, [] Defendant answered the questions asked even when told by Detective Rooks that "if there is something you don't want to say even though you know the answer I would rather you say I don't want to answer than to tell me a lie." [Def.'s Tr. 4]

10.    The detectives did not use coercive interview tactics, did not physically or verbally threaten [] Defendant or seek to deceive him in the course of the interview.

11.    The demeanor and statements of the detectives were not coercive and not deceptive.

12.     The questioning by the detectives was not coercive or deceptive [] Defendant was advised that he did not have to talk about anything he did not want to discuss and he responded when asked that he did not mind discussing the events in front of his parents.  He was not physically or verbally threatened during the questioning.  [] Defendant was not prevented from leaving and never asked to stop the questioning.

13.     [] Defendant's parents were with [] Defendant throughout the interview, seated in the same room and it is obvious from the record that they were paying attention to the statements that were made by both the detectives and [] Defendant.

14.     [] Defendant's statements were made freely, knowingly, intelligently and were free from coercion by the detectives, his parents, and any others.

> a.     During the course of the interview by police detectives, [] Defendant's parents made comments from time to time and even posed questions of their own to [] Defendant.  The parents also encouraged their son to be forthcoming and truthful to the police officers, but there is no evidence to suggest that [] Defendant's parents were acting on behalf of the Charlotte-Mecklenburg Police Department during the course of [] Defendant's interview.

> b.     The evidence presented showed that when police detectives contacted [] Defendant's parents, they agreed to meet with [] Defendant and the detectives.

> c.     There was no evidence to show that the parents met with the police detectives prior to the interview with [] Defendant or were coached by the detectives in order to conduct the interview.

d.	The detectives asked [] Defendant if he was comfortable speaking in front of his parents and [] Defendant answered "yeah". [Def.'s Tr. 4].

e.	Detective Rooks stated to [] Defendant and his parents, "we come here with no handcuffs, uh, I have no arrest warrants for you this is completely voluntary." [Def.'s Tr. 4].

f.	[] Defendant's parents urged [] Defendant to tell the truth but did not threaten [] Defendant or inflict corporal punishment to induce him to talk to the detectives.

g.	Despite the requests by his parents to tell the truth, [] Defendant's version of the events changed over the course of the interview and he gradually explained his involvement, demonstrating that in spite of the parents' encouragement to be truthful, [] Defendant exercised the ability to make his own choices regarding how much and what information to reveal to the detectives.

15.	[] Defendant continued to answer questions throughout the interview and never indicated that he wanted to speak to his parents alone or wanted to terminate the questioning.

16.	[] Defendant discussed the process of using various computer applications to buy and sell items via the internet.

17.	[] Defendant admitted his LetGo username was "CA" and that he used his cell phone and the LetGo app to lead the victim to the complex where the victim was killed.

18.	During the same interview, [] Defendant stated when the victim arrived he was shot and killed by an associate of [] Defendant during a failed robbery attempt.

[] Defendant also acknowledged, eventually, during the interview that [] Defendant also carried a gun to the meeting and that he knew that the victim was going to be robbed. ·

19.   The interview lasted an hour and seventeen minutes.

    a.   The length of the interview was not an unreasonable or coercive amount of time to discuss the events surrounding the robbery and death of Zachary Finch.

    b.   It is noted that [] Defendant changed his story during the interview and admitted to an increasing amount of information as the interview progressed, thereby adding to the time needed during the interview.

20.   Based on information gathered during the interview at his home, [] Defendant was arrested on July 20, 2017 and taken to the Law Enforcement Center (L.E.C.) where a custodial interview took place.

21.   After his arrest, CMPD Officers seized some items of clothing and shoes from his residence.  Officers also received from Defendant's father possession of a cell phone used by [] Defendant.  During the same time frame in which they conducted a custodial interview of [] Defendant, officers requested consent from [] Defendant to a search of that cell phone, which Defendant provided by his signature on a consent form, State's Exhibit D.  As appears below, the custodial interview conducted by police officers did not comply with the North Carolina statute and, therefore, any statements made by [] Defendant during the custodial interview will not be offered or received into evidence before the jury.  In spite of this statutory violation, it appears that Defendant knowingly and voluntarily consented to a search of his cell phone.

22.	The State concedes that law enforcement failed to comply with N.C.G.S. 7B-2101 (b) in conducting a custodial interview of [] Defendant by allowing him to waive the presence of his parents in the custodial interview.  Under G.S. 7B-2101(b) (*amended in 2015, effective December 1, 2015*), no in-custody admission or confession resulting from an interrogation may be admitted into evidence unless the confession or admission was made in the presence of a parent, guardian, custodian or attorney if the juvenile is less than 16 years of age.  This statute does not address the use by police officers of other evidence obtained, even in part, as a result of such custodial interview.

23.	[] Defendant purportedly "waived" his right to have his parent or attorney present during the custodial interview.  This interview was recorded.

24.	Defendant correctly asserts that the statements he provided after being advised of his rights at the Law Enforcement Center were not made in the presence of his parent, guardian, or attorney.

25.	During his in-custody interview, [] Defendant identified Ashanti Gatewood as a source of information.

26.	In the absence of his parent, guardian, custodian, or attorney, [] Defendant consented to a search of his cell phone while in the interview room at the L.E.C., signed a written consent form, and provided his cell phone password.

27.	Prior to the request for consent, law enforcement officers were aware of the following:

> a.	The victim was lured to the scene of his murder by "CA" via a cell phone app LetGo.

> b.	During [] Defendant's in-home interview []

> Defendant admitted he was "CA" and he used his cell phone and LetGo to communicate with the victim.
>
> c.      During the in-home interview, [] Defendant admitted that instead of selling a phone to the victim, [] Defendant and/or his associates tried to rob the victim, and the victim was shot during the robbery attempt.

28.      By providing the password to his cell phone, the iPhone 7 (black in color), law enforcement officers were able to access [] Defendant's social media accounts, including but not limited to Instagram, Snapchat, text messages, emails, etc., that contained incriminating information about this homicide.

29.      Based on the information downloaded from [] Defendant's cell phone, [] Defendant communicated by both calling and messaging Ashanti Gatewood immediately after the killing. Gatewood testified that on June 18, 2017, [] Defendant told her he killed someone.[2]

30.      Based on the information downloaded from [] Defendant's cell phone, [] Defendant communicated through Facebook messages with Travis Moore about shooting someone. Moore testified that [] Defendant told him he shot someone.

Based on these findings of fact, Defendant was in a non-custodial setting in his grandmother's home with his parents, being questioned for approximately an hour and seventeen minutes. Defendant was informed the discussion was voluntary, was not handcuffed or otherwise restrained, and was not coerced, deceived, or threatened.

---

[2] The trial court entered its written order after Defendant's trial.

¶ 24        Defendant's main contention challenging the denial of his motion to suppress his non-custodial statements is that his "parents bullied him into confessing[,]" because they thought the crime Defendant may have committed was simply a larceny. Defendant contends his parents "cursed at him, lectured him, and ordered him to 'man up[,]' arguing that "they significantly increased the pressure that [an officer] was already applying to [Defendant] in her efforts to extract a confession."

¶ 25        Although the law cited by Defendant does give a juvenile the right to have a parent or guardian present during questioning, none of the cases or statutes presented by Defendant prescribe any standard for the parents in their supervision of a juvenile's questioning by officers. Defendant had a right to have his parents present, *see generally* N.C. Gen. Stat. § 7B-2101 (2019), and his parents were present, "seated in the same room[,]" and "paying attention to the statements that were made by both the detectives and [] Defendant."

¶ 26        Defendant also cites to *Culombe v. Connecticut*, 367 U.S. 568, 630 (1961), where Defendant contends a family member of the adult defendant was used "to produce the confession[,]" but *Culombe* is inapposite, as that case did not involve the a minor or the parents of a minor. Further, the defendant "was taken by the police and held in the carefully controlled environment of police custody for more than four days before he confessed." *Id.* at 630–31. Here, while the presence of Defendant's parents and their statements were a factor to consider in the totality of the

circumstances, this factor alone cannot determine the voluntariness of Defendant's confession. *See Martin*, 228 N.C. App. at 689, 746 S.E.2d at 310.

¶ 27    Further, although Defendant does not challenge the findings of fact, Defendant takes issue with the trial court's use of the word "appear" as the order stated, "[Defendant] *appeared* to have a clear understanding of the questions being asked and what had actually transpired." (Emphasis added). Defendant argues that the trial court "improperly relied on appearances[,]" and although Defendant "*appeared* to understand his rights, . . . if he was unable to exercise those rights because of pressure placed on him during the interrogation or because of his own immaturity, then his confession was not voluntary." (Emphasis in original). In the context of the findings in the order, the statement that Defendant "appeared to have a clear understanding of the questions being asked and what had actually transpired" is one way of saying that, based upon Defendant's outward appearance, actions, and words as observed by the questioning officers, Defendant understood their questions and knew about the incident involving Zachary.

¶ 28    The trial court entered an order with thirty detailed findings of fact, some of which have sub-findings. The trial court then entered four pages of conclusions of law, with many sub-conclusions, and specifically set out which motions were addressed by each part of the order. The court thoroughly explained its decision to deny the motion to suppress for Defendant's "in home" statements, but to allow

suppression of his "in custody" statements. The trial court's findings of fact show that it properly considered the "totality of the circumstances" in determining Defendant's confession was voluntary. *Martin*, 228 N.C. App. at 689, 746 S.E.2d at 310.

¶ 29        As to the trial court's unchallenged findings, while "the presence or absence of one or more of these factors is not determinative[,]" *id.* at 690, 746 S.E.2d at 310 (citation, quotation marks, and brackets omitted), it is important to note that Defendant was not in custody during his questioning by the officers for the statements allowed before the jury. The trial court made findings regarding the circumstances of the questioning and concluded that Defendant was not in custody while being questioned in his home. Defendant does not challenge this conclusion. In fact, the trial court *allowed* Defendant's motion to suppress as to statements made "during a Custodial Interview occurring later . . . at the Law Enforcement Center." It was only the "statements made during an in home interview with his parents[,]" which the trial court determined was "non-custodial," that were allowed in trial.

¶ 30        Defendant filed a Memorandum of Additional Authority regarding the denial of his motion to suppress, citing one precedential[3] case, *State v. Lynch*, wherein the

---

[3] Defendant also cites to a case from the Seventh Circuit wherein the defendant was in custody. *See United States v. Fowler*, 476 F.2d 1091, 1093 (7th Cir. 1973) ("One need only recall his own adolescence to appreciate the impact upon this boy, *alone in a jail room, in custody of a postal inspector,* being warned of his constitutional rights." (emphasis added)).

defendant was in custody. *See State v. Lynch*, 271 N.C. App. 532, 539–40, 843 S.E.2d 346, 351–52 (2020) ("A short time after the robbery and shooting, *Defendant was apprehended and brought into custody*. He arrived at the police station at around 6:30 in the evening, where he was handcuffed and placed alone in a room, separated from his alleged accomplice who was also apprehended. At some point he was read his *Miranda* rights and did not ask for an attorney. Over six hours later, at 12:46 a.m., two interrogators entered his room, they uncuff[ed] him, and they proceeded to interrogate him." (emphasis added)). We also note that in *J.D.B. v. North Carolina*, 564 U.S. 261 (2011), the defendant raised similar issues, but in that case the defendant specifically challenged the determination of whether he was in custody and whether his juvenile status affected that analysis. Here, Defendant makes no argument regarding the conclusion that he was not in custody when questioned in his home. *See id.* at 264 ("This case presents the question whether the age of a child subjected to police questioning is relevant to the custody analysis of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).").

¶ 31      Ultimately, Defendant has not challenged any of the findings of fact upon which the trial court determined he made a voluntary, non-custodial statement. The trial court's findings of fact fully support its conclusions of law. Based upon the totality of the circumstances, we hold that Defendant's statement was voluntary, and

we affirm the trial court's denial of Defendant's motion to suppress his non-custodial statement.

## C. Jury Instruction

¶ 32        Defendant next argues that the trial court erred "by failing to instruct the jury on second-degree murder" as a lesser-included offense of first-degree murder "because there was evidence that supported the instruction." We disagree.

¶ 33        "It is well settled that a defendant is entitled to have all lesser degrees of offenses supported by the evidence submitted to the jury as possible alternative verdicts." *State v. Thomas*, 325 N.C. 583, 594, 386 S.E.2d 555, 561 (1989) (citation and internal quotation marks omitted). Where, as here, "the [S]tate proceeds on a first-degree murder theory of felony murder only, the trial court must instruct on all lesser-included offenses if [1] the evidence of the underlying felony supporting felony murder is in conflict *and* [2] *the evidence would support a lesser-included offense of first-degree murder.*" *State v. Gwynn*, 362 N.C. 334, 336, 661 S.E.2d 706, 707 (2008) (emphasis added) (citations, quotation marks, and brackets omitted). With respect to the latter, "[a]n instruction on a lesser-included offense must be given *only* if the evidence would permit the jury rationally to find [the] defendant guilty of the lesser offense *and to acquit him of the greater.*" *State v. Millsaps*, 356 N.C. 556, 561, 572 S.E.2d 767, 771 (2002) (emphasis added) (citation omitted).

¶ 34    If the jury could not rationally convict Defendant of second-degree murder and acquit him of felony murder, then our conclusion under prong (1) is irrelevant and Defendant is not entitled to a new trial.  Accordingly, the question here is whether the evidence would have permitted the jury rationally to find Defendant guilty of second-degree murder and acquit him of felony murder.  *State v. Williams*, 343 N.C. 345, 363, 471 S.E.2d 379, 389 (1996); *see also State v. Quick*, 329 N.C. 1, 28–29, 405 S.E.2d 179, 195–96 (1991); *State v. Rinck*, 303 N.C. 551, 565, 280 S.E.2d 912, 923 (1981).  Because we conclude that there is no evidence in the record from which a rational juror could find Defendant guilty of second-degree murder and not guilty of felony murder, we need not address whether the evidence supporting the underlying felony of attempted robbery is in conflict.

¶ 35    "Felony murder is a murder committed in the perpetration or attempted perpetration of certain felonies[,] including . . . robbery with a dangerous weapon." *State v. Workman*, 344 N.C. 482, 508, 476 S.E.2d 301, 315 (1996) (citation omitted). "Second-degree murder is the unlawful killing of a human being with malice but without premeditation and deliberation."  *State v. Thomas*, 350 N.C. 315, 346, 514 S.E.2d 486, 505 (1999) (citation omitted).

> [T]he element of malice may be established by at least three different types of proof: (1) express hatred, ill-will or spite; (2) commission of inherently dangerous acts in such a reckless and wanton manner as to manifest a mind utterly without regard for human life and social duty and

deliberately bent on mischief; or (3) a condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification.

*State v. Coble*, 351 N.C. 448, 450–51, 527 S.E.2d 45, 47 (2000) (citation and internal quotation marks omitted). "[I]t is well established that malice and unlawfulness may be inferred from the intentional use of a deadly weapon which proximately results in a death." *State v. Shuford*, 337 N.C. 641, 650, 447 S.E.2d 742, 748 (1994) (citations omitted).

¶ 36        Absent the jury finding Defendant guilty of attempted robbery with a dangerous weapon and felony murder, it is exceedingly difficult to see how any rational juror could conclude that Defendant, whether by himself or pursuant to a common plan with Tink, murdered Zachary with malice. There is simply no evidence that Zachary was killed other than in the course of an attempted robbery. There are only two factual scenarios in which Defendant could be found guilty of second-degree murder but not guilty of attempted robbery with a dangerous weapon and felony murder: (1) Defendant did not attempt to rob Zachary, but once Zachary arrived, Defendant spontaneously decided he felt like killing someone, and so he shot Zachary; or (2) Defendant did not attempt to rob Zachary, but instead he acted in concert with Tink to murder Zachary with malice, and Tink shot Zachary. The latter scenario contravenes any logical deduction to be had from any version of the evidence. The

former scenario is not much better, although it is the scenario that Defendant has

asked this Court to accept on appeal in support of his argument:

> Here, [Defendant]'s friend Travis testified that he chatted
> with [Defendant] over Facebook in June 2017. [Defendant]
> told Travis that he had shot and killed someone.
> Additionally, a forensic pathologist testified that [Zachary]
> died as the result of a gunshot wound. Viewed in the light
> most favorable to [Defendant], this evidence would have
> permitted a jury [] "rationally to find him guilty" of second-
> degree murder. Evidence that [Defendant] intentionally
> used a gun to kill [Zachary] was sufficient to establish
> malice for second-degree murder. Thus, the trial court
> erred by failing to instruct on second-degree murder.

(Citations omitted).

¶ 37     The problem with this argument is that it asks us, and the jury, to ignore all

of the State's evidence indicating that, if Defendant did himself shoot Zachary, he did

so during the course of an attempted robbery with a dangerous weapon. To hold

otherwise would require this Court to accept what no rational juror could ever accept

based on the evidence in the record. In order to accept Defendant's argument, the

jury would have to believe Defendant's statements that he killed Zachary but

disbelieve his statements and all of the other evidence indicating that he attempted

to rob Zachary.[4]

---

[4] For example, Defendant called his girlfriend shortly after the crime occurred and
told her that he had "just shot and robbed somebody." Defendant now asks us to accept the
possibility that the jury could believe only half of his statement—that he shot someone—but

¶ 38         Moreover, "[a] defendant is not entitled to an instruction on a lesser included offense merely because the jury could possibly believe some of the State's evidence but not all of it." *State v. Annadale*, 329 N.C. 557, 568, 406 S.E.2d 837, 844 (1991) "Defendant cannot have it both ways. He cannot tell the jury that he was innocent of the crime" of attempted robbery "and that [his] inculpatory statements were not true and also demand to have the jury instructed on second-degree murder . . . based on portions of his inculpatory statements which [a]re favorable to him when taken out of context." *State v. Corbett*, 339 N.C. 313, 336, 451 S.E.2d 252, 264 (1994). Such an unfounded "possibility of the jury's piecemeal acceptance of the State's evidence will not support the submission of a lesser included offense." *State v. Maness*, 321 N.C. 454, 461, 364 S.E.2d 349, 353 (1988) (citations omitted); *see also Thomas*, 350 N.C. at 347, 476 S.E.2d at 506 (holding that a defendant charged with first-degree murder was not entitled to an instruction on second-degree murder because "the only evidence offered by [the] defendant to negate first-degree murder was his own testimony denying his involvement in the crime").

¶ 39         Simply stated, "[a] defendant is entitled to have a lesser-included offense submitted to the jury only when there is evidence to support that lesser-included

---

disbelieve the other half indicating that he attempted to rob Zachary. The jury would also have to believe that Defendant shot Zachary not because he was attempting to rob him, but because he abruptly decided to kill someone.

offense." *Thomas*, 350 N.C. at 346, 476 S.E.2d at 505 (citation omitted); *see also State v. Brewer*, 325 N.C. 550, 577, 386 S.E.2d 569, 584 (1989) (stating that where "there is no positive evidence of a lesser offense[,] . . . the jury need only decide whether [the] defendant was the perpetrator of the crime charged" (citation omitted)). There is no evidence in this case to support a conviction of second-degree murder and an acquittal of felony murder. Defendant is not entitled to a new trial.

**D. Transfer Hearing**

¶ 40        Defendant contends that "[t]he trial court erred by failing to order a discretionary transfer hearing because the juvenile petition only alleged that [he] committed second-degree murder[,] and a discretionary hearing was required as a matter of due process." Defendant argues that "[t]he juvenile petition did not contain facts indicating that [he] committed first-degree murder and, so, a discretionary transfer hearing should have occurred as required under N.C. Gen. Stat. § 7B-2203." Defendant requests that this Court remand "for a court to determine whether [Defendant's] case warranted transfer under a discretionary scheme." However, Defendant already had a transfer hearing in district court, and Defendant did not appeal the district court's order to superior court as required by N.C. Gen. Stat. § 7B-

2603 (2017),[5] so Defendant is not entitled to further review of this issue.

¶ 41        Juvenile petitions were filed alleging Defendant had committed a Class A felony in violation of N.C. Gen. Stat. § 14-17, as he "did unlawfully, willfully and feloniously . . . and of malice aforethought kill and murder Zachary Finch[,]" and a Class D felony in violation of North Carolina General Statute § 14-87, as he "did unlawfully, willfully and feloniously steal, take, and carry away another's personal property[.]" The district court held a transfer hearing on 8 January 2018 and heard extensive arguments regarding the evidence against Defendant as well as the factors relevant to a discretionary transfer under N.C. Gen. Stat. § 7B-2203. *See* N.C. Gen. Stat. § 7B-2203 (2019). Defendant argued that the State's evidence did not establish probable cause for first-degree murder, particularly a lack of evidence that Defendant was the shooter, and asked for the district court to find no probable cause for first-degree murder and to exercise its discretion to order that Defendant remain in juvenile court as to second-degree murder. The district court entered an order regarding the transfer hearing on the same day finding "probable cause to believe that the juvenile committed . . . first degree murder G.S. 14-17 [and] robbery with a

---

[5] N.C. Gen. Stat. § 7B-2603 was amended in 2019, effective December 1, but both versions of the statute note that a juvenile must appeal a transfer from district to superior court. *See generally* N.C. Gen. Stat. § 7B-2603 (2021) ("[A]ny order transferring jurisdiction of the district court in a juvenile matter to the superior court may be appealed to the superior court for a hearing on the record. Notice of the appeal must be given in open court or in writing within 10 days after entry of the order of transfer in district court.").

dangerous weapon G.S. 14-87." (Capitalization altered). The district court determined that "[f]irst degree murder is a class A felony and the court is required to transfer the matter to superior court pursuant to NC Statute G.S 7B-2200." (Capitalization altered). Again, a transfer order under N.C. Gen. Stat. §§ 7B-2201 and 2203 must be appealed to superior court. This was properly reflected on the transfer form order, AOC-J-442, Rev. 12/17, noting "If the Transfer Order is appealed, use form AOC-G-115 to order a transcript of the juvenile proceeding transferred to superior court." Defendant did not appeal the transfer order to superior court.

¶ 42    Defendant is not entitled to another transfer hearing, as he already had one, and, as the State notes, Defendant failed to appeal the transfer order and preserve this issue under N.C. Gen. Stat. § 7B-2603 (2017).[6] *See* N.C. Gen. Stat. § 7B-2603(a) ("[A]ny order transferring jurisdiction of the district court in a juvenile matter to the superior court may be appealed to the superior court for a hearing on the record. Notice of the appeal must be given in open court or in writing within 10 days after entry of the order of transfer in district court."). This argument is without merit.

## III.    Conclusion

¶ 43    For the foregoing reasons, we hold that Defendant received a fair trial, free

---

[6] N.C. Gen. Stat. § 7B-2603 was amended in 2019, effective December 1, but both versions of the statute note that a juvenile must appeal a transfer from district to superior court. *See generally* N.C. Gen. Stat. § 7B-2603.

from error.

NO ERROR.

Judge MURPHY concurs.

Chief Judge STROUD concurs in part and dissents in part by separate opinion.

STROUD, Chief Judge, concurring in part and dissenting in part.

¶ 44    While I concur with the majority's analysis as to the denial of defendant's challenge to a juror for cause, denial of defendant's motion to suppress, and the trial court's failure to order another transfer hearing, I write separately on the issue of the jury instruction because I believe the evidence supported an instruction for the lesser-included offense of second-degree murder, and therefore, I dissent from that portion of the majority's opinion.

¶ 45    Defendant contends "[t]he trial court erred by failing to instruct the jury on second-degree murder because there was evidence that supported the instruction." Before the trial court, defendant requested a second-degree murder instruction.

> In *State v. Millsaps*, 356 N.C. 556, 572 S.E.2d 767 (2002), we comprehensively explained that when the [S]tate proceeds on a first-degree murder theory of felony murder only, the trial court must instruct on all lesser-included offenses if the evidence of the underlying felony supporting felony murder is in conflict and the evidence would support a lesser-included offense of first-degree murder. Conversely, when the [S]tate proceeds on a theory of felony murder only, the trial court should not instruct on lesser-included offenses *if the evidence as to the underlying felony supporting felony murder is not in conflict and all the evidence supports felony murder.*

*State v. Gwynn*, 362 N.C. 334, 336, 661 S.E.2d 706, 707 (2008) (emphasis added) (citations, quotation marks, and brackets omitted); *see State v. Thomas*, 325 N.C. 583, 594, 386 S.E.2d 555, 561 (1989) ("The next question is whether there is here evidence to support a conviction for involuntary manslaughter. Under North Carolina and

*Stroud, CJ., concurring in part and dissenting in part.*

federal law a lesser-included offense instruction is required if the evidence would permit a jury rationally to find defendant guilty of the lesser offense and acquit him of the greater. The test is whether there is the presence, or absence, of any evidence in the record which might convince a rational trier of fact to convict the defendant of a less grievous offense. Where the State's evidence is positive as to each element of the offense charged *and there is no contradictory evidence* relating to any element, no instruction on a lesser-included offense is required. It is well settled that a defendant is entitled to have all lesser degrees of offenses supported by the evidence submitted to the jury as possible alternative verdicts. On the other hand, the trial court need not submit lesser-included degrees of a crime to the jury when the State's evidence is positive as to each and every element of the crime charged *and there is no conflicting evidence relating to any element of the charged crime.*") (first emphasis added) (second emphasis in original) (citations, quotation marks, and brackets omitted)); *see also State v. Juarez*, 369 N.C. 351, 357, 794 S.E.2d 293, 299 (2016) (noting second-degree murder as a lesser offense of first-degree murder). Here, the State proceeded only on a theory of first-degree murder, specifically felony murder, with the underlying felony being attempted robbery.

¶ 46     The State contends this issue was not preserved for appeal. But defendant requested an instruction on second-degree murder, and the trial court acknowledged it by stating to the State, "The Defendant has asked for second degree, voluntary, and

involuntary.  Do you want to say anything about those?"  Thus, this issue is preserved and properly before us.

> It is well-established that
>> the trial court must submit and instruct the jury on a lesser included offense when, and only when, there is evidence from which the jury could find that the defendant committed the lesser included offense.  However, when the State's evidence is positive as to every element of the crime charged and there is no conflicting evidence relating to any element of the crime charged, the trial court is not required to submit and instruct the jury on any lesser included offense.  The determining factor is the presence of evidence to support a conviction of the lesser included offense.
>
> Failure to so instruct the jury constitutes reversible error not cured by a verdict of guilty of the offense charged.

*State v. Boozer*, 210 N.C. App. 371, 377, 707 S.E.2d 756, 762 (2011) (citations, quotation marks, and brackets omitted).

¶ 47      Here, there was a conflict in the evidence regarding an element of felony murder.  Viewed in the light most favorable to the State, the evidence of attempted robbery is substantial as defendant had Zachary come to a location of his choosing based on the lie that defendant was a father with his children on Father's Day; he arrived with a gun and another individual with a gun whom he knew had a plan to rob Zachary.  *See State v. Van Trusell*, 170 N.C. App. 33, 37, 612 S.E.2d 195, 198 (2005) ("The essential elements of the crime of attempted robbery with a dangerous

weapon are: (1) the unlawful attempted taking of personal property from another; (2) the possession, use or threatened use of a firearm or other dangerous weapon, implement or means; and (3) danger or threat to the life of the victim." (citation and quotation marks omitted)).

¶ 48        But the State played defendant's statement to the police for the jury, and in that statement, defendant denies multiple times that he planned to or attempted to rob Zachary. Defendant stated several times in answer to questions about the robbery that his plan was only to sell the phone and that he opposed Tink's plan to rob Zachary. Defendant said, "My plan was to sell the phone[,]"and, "[Tink] was like I want to rob him, I was like you ain't got to rob him just sell him the phone[.]" Defendant was asked, "But then yall talked then what? One person isn't gonna sell and one [] person gonna rob, does that make sense, when you guys go to do something together you['re] either gonna sell or you['re] gonna rob. Right? So, which one were you decided on when you met that man?" to which defendant responded, "Selling my phone." The State even acknowledged the conflicting evidence when it stated to the jury in closing, "This statement that you have all seen and now heard, this is a made-up fantasy story. There was never going to be and there never was any intent to sell a phone out there."

¶ 49        For purposes of review of defendant's request for an instruction on second-degree murder, this Court must consider whether "all" the evidence supports the

*Stroud, CJ., concurring in part and dissenting in part.*

underlying felony of felony murder. *Gwynn*, 362 N.C. at 336, 661 S.E.2d at 70. In other words, if *any* of the evidence supports that defendant did not attempt to rob Zachary, a lesser offense instruction should have been provided. *See generally id.* Here, defendant's repeated statements regarding a lack of intent to rob or actual robbery support the request for the instruction on second-degree murder. A thorough reading of defendant's statement leaves factual questions about what exactly defendant thought would happen when he was armed and took another armed individual with him whom he knew had an intent to rob with him to meet Zachary; any reasonable adult considering the situation would likely know something more was going to occur than just selling the phone. Yet, defendant was not a reasonable adult; he was a 15-year-old who plainly, throughout his statement, seemed to believe Tink could talk a big game, but he would not actually shoot anyone, even though he was armed. According to defendant, Tink was always armed, but he apparently did not shoot people every day, and defendant -- who also had a gun -- intended only to sell the phone. This conflicting evidence presents a question of credibility and weight of the evidence which must be resolved by a jury. *See generally Thomas*, 325 N.C. at 594, 386 S.E.2d at 561. Because the State chose to proceed *only* on the theory of felony murder based upon the felony of attempted robbery, any conflicting evidence of the robbery also brings the murder into question. *See generally Gwynn,* 362 N.C. at 336, 661 S.E.2d at 707.

¶ 50          Thus, while viewed in the light most favorable to the State, the evidence demonstrates an attempted robbery, defendant's own statements that he had no plan to rob Zachary and that he took no steps to rob Zachary *is* conflicting evidence as to the underlying felony of attempted robbery. *See Gwynn*, 362 N.C. at 336, 661 S.E.2d at 707. But of course, this Court does not view the evidence in the light most favorable to the State for issues regarding jury instructions on lesser-included offenses; instead, we view the evidence in the light most favorable to defendant. *See State v. Brichikov*, 2022-NCCOA-33, ¶ 1, 869 S.E.2d 339, 341 ("A defendant is entitled to a jury instruction on a lesser included offense when the evidence, viewed in the light most favorable to the defendant, could support a jury verdict on that lesser included offense."). But the majority is viewing the evidence in the light most favorable to the State and resolving issues of credibility and weight against the defendant. On appeal, this Court cannot make its own determinations of credibility or weigh the evidence, but rather must consider whether there was any evidence that is "in conflict" "as to the underlying felony[.]" *See Gwynn*, 362 N.C. at 336, 661 S.E.2d at 707. Indeed, some evidence was "in conflict[,]" and I cannot say that *"all"* of the evidence supports the underlying felony of attempted robbery. *Id.* The issue is not, as the majority frames it, if we believe defendant's story, but rather if the jury might have believed it. It is important to note the jury *acquitted* defendant on the count of conspiracy to commit robbery with a firearm, so it appears the jury believed at least some of

defendant's account of events or was not fully convinced by the State's evidence regarding a plan to commit robbery. If given the option to convict on second-degree murder, I cannot say for certain what the jury would have determined.

The State contends that because the jury convicted defendant of attempted robbery it cannot be prejudicial that defendant did not receive a second-degree murder instruction. In other words, upon finding defendant guilty of attempted robbery, the felony murder conviction naturally followed and was the required verdict. But as explained in *Thomas*, "That the State elected to prosecute defendant solely on a felony murder theory does not abrogate defendant's entitlement to have the jury consider all lesser-included offenses supported by the indictment and raised by the evidence." *Thomas*, 325 N.C. at 591, 386 S.E.2d at 559–60. This is because, "in a case in which one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction." *Id.* at 599, 386 S.E.2d at 564.

> The United States Supreme Court has expounded on the importance of permitting the jury to find a defendant guilty of a lesser included offense supported by the evidence by noting that the doctrine aids both the prosecution and the defense. *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392. It aids the prosecution when its proof may not be persuasive on some element of the greater offense, and it is beneficial to the defendant because *it affords the jury a less drastic alternative than the choice between conviction of the offense charged and acquittal.* The Supreme Court has also expressed concern

> that in a case in which one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, *the jury is likely to resolve its doubts in favor of conviction despite the existing doubt, because the jury was presented with only two options: convicting the defendant or acquitting him outright.* *Keeble v. United States*, 412 U.S. 205, 212–213, 93 S.Ct. 1993, 1997–98, 36 L.Ed.2d 844, 850 (1973) (emphasis in original).
> We share this concern in this case. While some reasonable doubt could have existed regarding whether defendant acted in concert with Brewer when he fired at the Calhoun residence, given the conflicting evidence on this aspect of the case, almost all the evidence points to some criminal culpability on defendant's part. *It was important, therefore, that the jury be permitted to consider whether defendant was guilty of the lesser included offense of involuntary manslaughter and not be forced to choose between guilty as charged or not guilty.*

*Id.* (emphasis added) (citations, quotation marks, and ellipses omitted).

¶ 52        Here too, where "one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction despite the existing doubt, because the jury was presented with only two options: convicting the defendant or acquitting him outright." *Id.* Furthermore, in this case, the jury found defendant not guilty of conspiracy to commit robbery with a firearm but guilty of attempted robbery with a firearm, indicating they believed defendant did not conspire with Tink to rob Zachary, as defendant repeatedly stated during the questioning by officers. Thus, without an instruction on second-degree murder, the jury's only options were to "convict[ ] the

*Stroud, CJ., concurring in part and dissenting in part.*

defendant or acquit[ ] him outright." *Id.* Thus, in accord with *Thomas*, I would hold

defendant must receive a new trial. *See Thomas*, 325 N.C. 583, 386 S.E.2d 555.

¶ 53    Therefore, I concur in part and dissent in part.